**MORTON INTERNATIONAL, INC. et al., Appellees,**

v.

**HARBOR INSURANCE COMPANY, Appellant, et al.**

[Cite as *Morton Internatl., Inc. v. Harbor Ins. Co.* (1992), 79 Ohio App.3d 183.]

Court of Appeals of Ohio,
Hamilton County.

No. C–910182.

Decided April 8, 1992.

184

*Taft, Stettinius & Hollister, Robert G. Stachler, Thomas C. Hill* and *James E. Britain,* for appellees.

*Davis & Young Co., L.P.A.,* and *David J. Fagnilli,* for appellant.

*Per Curiam.*

This cause came on to be heard upon the appeal, the transcript of the docket, journal entries and original papers from the Hamilton County Court of Common Pleas, the transcript of the proceedings, the briefs and the arguments of counsel.

Defendant-appellant, Harbor Insurance Company ("Harbor"), has taken the instant appeal from the entry of partial summary judgment in favor of

plaintiffs-appellees, Morton International, Inc. ("Morton"), American Cyanamid Company ("Cyanamid"), and Thiokol Corporation ("Thiokol") on the plaintiffs' complaint seeking, *inter alia,* a declaration of the parties' rights and obligations under an excess-liability policy of insurance issued by Harbor. Harbor advances on appeal two assignments of error in which it challenges the denial of its motion for a change of venue or for dismissal on the basis of *forum non conveniens* and the entry of partial summary judgment for the plaintiffs.

Thiokol is the successor by merger to the assets and liabilities of Southwest Specialty Chemicals, Inc. ("Southwest"). Morton is the successor by assignment of the rights and liabilities of Thiokol with respect to Southwest.

In November 1974, Southwest entered into an agreement with Cyanamid to produce an herbicide for Cyanamid at Southwest's Newell, West Virginia, plant. In March 1975, Southwest engaged Browning Ferris Industries ("BFI") to dispose of the waste generated in the manufacture of the herbicide. From February 1975 through November 1976, BFI transported the waste to the Summit National Services Deerfield Dump Site ("Summit site"), a waste-disposal facility that was licensed by the Ohio Environmental Protection Agency ("Ohio EPA") and located in Portage County, Ohio.

The Summit site closed in 1979. As part of the governmental efforts to recoup the site's environmental clean-up costs, Morton's corporate predecessor and other potentially responsible parties were named in 1981 as defendants in an action brought by the Ohio EPA in the United States District Court for the Northern District of Ohio, in 1987, as respondents to a "Section 106 Order" demanding corrective action issued by the United States Environmental Protection Agency ("U.S. EPA"), and in 1990 as defendants in a U.S. EPA action in federal court (hereinafter, "Summit claims"). In 1987, Morton's corporate predecessor paid $25,000 toward settlement of the Section 106 order, and, in June 1991, a "Final Consent Order," under which the liability of Morton and Cyanamid was estimated to be between $5,000,000 and $6,000,000, was entered in the Ohio EPA and U.S. EPA actions.

Southwest was a named insured under an excess-liability insurance policy issued by Harbor to Southwest's corporate parent for the three annual coverage periods from August 29, 1975, to August 29, 1978. Cyanamid was added as a named insured under the policy by an endorsement found by the trial court to be effective not later than March 5, 1976. The position taken by the plaintiffs' primary and excess-liability insurers, including Harbor, that their policies imposed no obligation on the insurers to indemnify the plaintiffs for amounts paid in settlement of the Summit claims, prompted the institution of the action underlying the instant appeal.

## I

Harbor, in its first assignment of error, challenges the denial of its motion for a change of venue or for dismissal on the basis of *forum non conveniens*. The challenge is untenable.

## A

Civ.R. 3 governs the matter of venue. Civ.R. 3(C)(1) empowers a trial court to transfer an action commenced in a county where venue is improper to a county where venue is proper upon the timely-filed motion of a defendant pursuant to Civ.R. 12(B)(3). Civ.R. 3(B) defines where venue is proper, providing in relevant part:

"(B) Venue: Where Proper. Any action may be venued, commenced, and decided in any court in any county. * * * Proper venue lies in any one or more of the following counties:

" * * *

"(6) The county in which all or part of the claim for relief arose * * *."

When venue is proper under Civ.R. 3(B) as to one party or one claim for relief, it is proper as to all. Civ.R. 3(E). An action may be transferred from a county where venue is proper only "when it appears that a fair and impartial trial cannot be had in the county in which the suit is pending." Civ.R. 3(C)(4).

Morton alleged in its amended complaint that "statements of position" issued by Harbor's co-defendant Select Insurance Company which "[gave] rise to [Morton's] action were sent to Morton's representatives in Hamilton County." Thus, pursuant to Civ.R. 3(B)(6), Hamilton County was a proper venue. Harbor has not alleged, either on appeal or in the proceedings below, that a fair and impartial trial could not be had in Hamilton County. Therefore, the trial court did not err in denying Harbor's motion for a change of venue.

## B

Under the common-law doctrine of *forum non conveniens*, as adopted in Ohio, "a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." *Chambers v. Merrell–Dow Pharmaceuticals, Inc.* (1988), 35 Ohio St.3d 123, 126, 519 N.E.2d 370, 372–373 (quoting *Gulf Oil Corp. v. Gilbert* [1947], 330 U.S. 501, 507, 67 S.Ct. 839, 842, 91 L.Ed. 1055, 1062). The disposition of a motion to dismiss an action on the basis of *forum non conveniens* is committed to the sound discretion of the trial court. On appeal, a reviewing court is not required to reweigh the public and private interest factors relevant to the trial court's disposition of the motion and must give "substantial deference" to the

lower court's decision when its balancing of these factors is "reasonable." An appellate court's scope of review is thus limited to a determination of whether the trial court abused its discretion. *Id.,* 35 Ohio St.3d at 127, 132–133, 519 N.E.2d at 374.

■ Upon consideration of the public and private interest factors set forth in *Chambers, supra,* we cannot say that the trial court abused its discretion in denying Harbor's motion to dismiss on the basis of *forum non conveniens.* We, therefore, overrule Harbor's first assignment of error.

## II

In its second assignment of error, Harbor challenges the entry of partial summary judgment in favor of the plaintiffs. We find this challenge to be well taken.

■ A party seeking to recover upon a claim may move, with or without supporting affidavits, for summary judgment in his favor on all or any part of the claim. Civ.R. 56(A). A motion for summary judgment may be granted if the court, upon reviewing the inferences to be drawn from the underlying facts set forth in the pleadings, depositions, answers to interrogatories, written admissions, and affidavits in a light most favorable to the party opposing the motion determines:

(1) that no genuine issue of material fact remains to be litigated;

(2) that the moving party is entitled to judgment as a matter of law; and

(3) that the evidence demonstrates that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party opposing the motion. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267; Civ.R. 56(C).

The insurance policy issued by Harbor to Southwest's corporate parent required Harbor to provide indemnification in excess of primary insurance coverage "for all sums which the Insured shall be obligated to pay by reason of the liability * * * imposed upon the Insured by law * * * for damages on account of * * * Property Damage * * * caused by or arising out of each occurrence * * * during the policy period." The policy defined "the Insured" to include a "Named Insured," and the term "Damages" to include "damages or loss of use of property resulting from property damage." The phrase "Property Damage," as used in the policy, was defined to include "physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom * * *." The policy defined an "occurrence" as "an accident including continuous or repeated exposure to conditions, which results in * * * property

damage * * * neither expected not [*sic*] intended from the standpoint of the Insured."

The property-damage liability coverage provided under the policy was subject to the policy's "pollution exclusion" and "petroleum exclusion." The petroleum exclusion excluded from coverage:

"(h) * * * property damage arising out of the discharge, dispersal, release or escape of * * * (ii) oil or other petroleum substance or derivative (including any oil refuse or oil mixed with wastes) into or upon any watercourse or body of water, whether or not such discharge, dispersal, release or escape is sudden and accidental but only with respect to [specified] operations [, including] * * * Chemical Manufacturing."

The pollution exclusion excluded from coverage:

"(h) * * * property damage arising out of the discharge, dispersal, release or escape of: (i) smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water. * * * "

The policy provided an exception to the pollution exclusion "if such discharge, dispersal, release or escape [was] sudden and accidental."

The entry of partial summary judgment for the plaintiffs against Harbor consisted of a declaration that Harbor was obligated under the policy to indemnify the plaintiffs for amounts paid in settlement of the Summit claims in excess of an aggregate amount of $300,000 and a declaration that the plaintiffs were entitled to attorney fees and the costs incurred in securing indemnification. The declaration of Harbor's obligation of indemnification was predicated upon the trial court's determination (1) that the environmental damage alleged in the Summit claims constituted "Property Damage" and, being "unexpected and unintended" from the standpoint of the plaintiffs and their predecessors, arose out of an "occurrence"; (2) that the amounts paid or to be paid by the plaintiffs in settlement of the Summit claims constituted "sums" that the plaintiffs have or will become "obligated to pay by reason of liability imposed upon [the plaintiffs] by law" as "damages" because of "Property Damage" arising out of an "occurrence," within the meaning of the policy; and (3) that neither the pollution exclusion nor the petroleum exclusion operated to bar coverage of the Summit claims.

■ In support of its challenge on appeal to the entry of partial summary judgment for the plaintiffs, Harbor contends (1) that the environmental damage alleged in the Summit claims did not constitute "Property Damage"; (2) that the amounts paid in settlement of the claims did not constitute sums

the plaintiffs were obligated by law to pay as "damages"; (3) that issues of fact remained as to whether the environmental damage alleged in the Summit claims was "neither expected [nor] intended from the [plaintiffs'] standpoint" and thus arose out of an "occurrence"; (4) that issues of fact remained as to whether coverage was excluded under the pollution exclusion or the petroleum exclusion; and (5) that issues of fact remained as to the plaintiffs' entitlement to an award of attorney fees and costs.

Our decision in *Kipin Industries, Inc. v. American Universal Ins. Co.* (1987), 41 Ohio App.3d 228, 535 N.E.2d 334, compels the conclusion that, for purposes of the Harbor policy, the environmental damage alleged in the Summit claims constituted "Property Damage" and the plaintiffs' settlement payments constituted sums payable as "damages." The evidentiary material submitted by Harbor on the motion for summary judgment in no way controverts the plaintiffs' substantiated assertion that they "neither expected [nor] intended" the environmental damage alleged in the Summit claims. Therefore, the damage must be said to have arisen out of an "occurrence," as that term is defined in the Harbor policy. See *id.* at 231, 535 N.E.2d at 337–338. Our determination that no issue of fact remained as to whether the environmental damage alleged in the Summit claim was either expected or intended is also, under *Kipin, supra,* dispositive of Harbor's contention that coverage was excluded under the pollution exclusion. See *id.* at 231, 535 N.E.2d at 338.

Harbor asserts, however, that conflicts between Ohio law and Texas law give rise to a choice-of-law problem, that Ohio choice-of-law principles mandate the application of Texas law, and that, with respect to the pollution exclusion, the application of Texas law would yield a result contrary to that mandated by *Kipin, supra.* We are unpersuaded.

In *Kipin, supra,* we held that the "sudden and accidental" exception to a pollution exclusion virtually identical to the pollution exclusion contained in the Harbor policy was, in essence, a restatement of the definition of an "occurrence," under which coverage is afforded when the damage was "neither expected nor intended." Accord *Buckeye Union Ins. Co. v. Liberty Solvents & Chemicals Co.* (1984), 17 Ohio App.3d 127, 17 OBR 225, 477 N.E.2d 1227. Thus, it follows that, if the environmental damage was unexpected and unintended from the standpoint of the polluter and, therefore, arose out of an "occurrence," the "discharge, dispersal, release or escape" of pollutants was also "sudden and accidental" and the pollution exclusion, by virtue of its "sudden and accidental" exception, will not operate to exclude coverage.

A review of Texas law yields no authoritative interpretation of the "sudden and accidental" exception to the pollution exclusion. Harbor maintains that an Ohio court required by Ohio choice-of-law principles to apply Texas law must interpret the pollution exclusion as would a Texas court and that a Texas court would follow those state courts that find the language of the pollution exclusion to be unambiguous and read the exclusion to bar coverage unless the discharge of pollution is "both sudden, meaning abrupt and lasting only a short time, and accidental, meaning unexpected." See, *e.g.*, *Lower Paxton Twp. v. United States Fid. & Guar. Co.* (1989), 383 Pa.Super. 558, 557 A.2d 393, 399. We find, however, that, even if we accept for the sake of argument Harbor's proposition that a conflict exists between Ohio law and Texas law which gives rise to a choice-of-law problem, we are unable to conclude that the trial court's application of the law of this jurisdiction to interpret the pollution exclusion constituted error.

■■■ In Ohio, the analysis and resolution of a choice-of-law problem must be based upon the principles set forth in Section 188 of 1 Restatement of the Law 2d (1971), Conflict of Laws. *Nationwide Mut. Ins. Co. v. Ferrin* (1986), 21 Ohio St.3d 43, 21 OBR 328, 487 N.E.2d 568; *Gries Sports Enterprises, Inc. v. Modell* (1984), 15 Ohio St.3d 284, 15 OBR 417, 473 N.E.2d 807, certiorari denied (1985), 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654. With respect to the Summit claims, Ohio is the place of performance and the situs of the subject matter of the Harbor policy. Under the principles set forth in Section 188, Ohio may fairly be said to bear the most significant relationship to the policy. Compare *Morton Internatl., Inc. v. Aetna Cas. & Sur. Co.* (Oct. 2, 1991), Hamilton App. No. C–900283, unreported, 1991 WL 201651. Therefore, our decision in *Kipin, supra,* is controlling and, upon the state of the record before us, compels the conclusion that no issues of fact remain as to whether coverage was excluded under the pollution exclusion.

■■■ The petroleum exclusion, unlike the pollution exclusion, can operate to exclude coverage under the Harbor policy regardless of whether the "discharge, dispersal, release or escape" of pollutants was "sudden and accidental." It need only be demonstrated (1) that the "property damage" for which coverage under the policy is afforded "[arose] out of the discharge, dispersal, release or escape of * * * oil or other petroleum substance or derivative (including any oil refuse or oil mixed with wastes)"; (2) that the pollutant was "discharge[d], dispers[ed], release[d] or escape[d] * * * into or upon any watercourse or body of water"; and (3) that the exclusion is being invoked with respect to one of the "operations" specified therein, including "Chemical Manufacturing."

It is beyond cavil that Southwest was engaged in "Chemical Manufacturing." The evidence before us also supports a positive finding on the exclusion's requirement of a "discharge * * * [or] release" of pollutants "into or upon any watercourse or body of water" and on the requirement of a causal link between the "property damage" and the "discharge * * * [or] release" of pollutants when the U.S. EPA's complaint against Morton, Cyanamid and other potentially responsible parties, submitted by the plaintiffs in support of their motion for partial summary judgment, alleged environmental damage resulting from the release and discharge of hazardous substances from the Summit site "into groundwater and surface water on, under and adjacent to the [site] * * * and into surface waters on, adjacent to and flowing from the [site]."[1] Finally, the deposition testimony of Donald Georgeoff, former president and sole shareholder of the corporate entity that operated the Summit site, and of Walter Hladky, Henry Clancy and Stephen Levy, employees of the plaintiffs or their corporate predecessors, gives rise to an issue of fact as to whether the waste generated in Southwest's manufacture of Cyanamid's herbicide and shipped to the Summit site consisted of "oil or other petroleum substance or derivative (including any oil refuse or oil mixed with wastes)." We, therefore, hold that summary judgment in the form of a declaration that Harbor was obligated to indemnify the plaintiffs was improvidently entered when there remained triable issues relevant to the determinative issue of whether the petroleum exclusion operated to bar coverage under the policy.

Turning to Harbor's challenge to the declaration that the plaintiffs were entitled to an award of attorney fees and costs, we note that an entitlement to fees and costs is contingent upon a determination that coverage was afforded under the policy. The declaration of the plaintiffs' entitlement to attorney fees and costs is, therefore, vitiated by our determination that issues of fact remain relevant to whether coverage is barred under the petroleum exclusion.

---

1. The terms "watercourse" and "body of water," employed in the petroleum exclusion to describe the environment to which the exclusion applies, may fairly be said to encompass "surface water" as that term is used in Section 9601 *et seq.*, Title 42, U.S.Code. See, *e.g.*, Section 9601(8), Title 42, U.S.Code (which defines "environment" to include "(A) the navigable waters, the waters of the contiguous zone, and the ocean waters of which the natural resources are under the exclusive management authority of the United States under the Magnuson Fishery Conservation and Management Act of 1976 and (B) any other surface water, groundwater, * * * land surface * * * or ambient air * * *."); Section 9605(c)(2), Title 42, U.S.Code (which speaks of "surface water" that "is, or can be, used for recreation or potable water consumption" and contemplates "the potential migration of any hazardous substance or pollutant or contaminant through such surface water to downstream sources of drinking water"); compare Section 9601(12), Title 42, U.S.Code (which defines "groundwater" as "water in a saturated zone or stratum beneath the surface of land or water").

Upon our determination that the trial court erred in granting partial summary judgment for the plaintiffs in the form of declarations that the policy imposed upon Harbor an obligation of indemnification and that the plaintiffs were entitled to attorney fees and costs, we sustain Harbor's sole assignment of error, reverse the judgment entered below and remand this cause for further proceedings consistent with law and this decision.

*Judgment reversed*
*and cause remanded.*

SHANNON, P.J., HILDEBRANDT and UTZ, JJ., concur.