MORTON INTERNATIONAL, INC., Appellee and Cross–Appellant, et al.,

v.

AETNA CASUALTY & SURETY COMPANY, Appellant and Cross–Appellee, et al.

[Cite as *Morton Internatl., Inc. v. Aetna Cas. & Sur. Co.* (1995), 106 Ohio App.3d 653.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–940407, C–940430.

Decided Sept. 29, 1995.

Order Granting Reconsideration and
Amending Opinion Nov. 3, 1995.

654

655

*Taft, Stettinius & Hollister, Robert G. Stachler* and *Thomas C. Hill,* for appellee and cross-appellant.

*C.J. DeMichelis, Joseph K. Wehby* and *Joseph C. Gruber,* for appellant and cross-appellee.

HILDEBRANDT, Judge.

## I.  INTRODUCTION

Defendant-appellant and cross-appellee, Aetna Casualty & Surety Company ("Aetna"), appeals from the July 23, 1993 judgment of the Hamilton County Court of Common Pleas which ruled that the law of the state of Washington applies to the Western Processing Company and Standard Equipment Company claims ("claims") against Aetna's insured, plaintiff-appellee and cross-appellant, Morton International, Inc. ("Morton").  Aetna advances three assignments of error in its appeal, alleging that the trial court erred by (1) applying the law of Washington and not Pennsylvania in its analysis of the insurance contract;  (2) granting Morton's motion for partial summary judgment[1] as to the claims;  and (3) granting prejudgment interest to Morton.

In its cross-appeal, Morton's solitary assignment of error contends that the trial court erred by failing to grant Morton its prosecution costs for its action to establish its rights under Aetna's policy.  For the reasons that follow we affirm in part and reverse in part the trial court's judgment.

## II.  PROCEDURAL POSTURE AND FACTS

The instant case is an appeal of the trial court's determination, following remand by this court, that Washington law applies to the determination of the parties' rights and obligations under a comprehensive general liability insurance policy.  The facts and prior procedural history are set forth more fully in our prior decision, *Morton Internatl., Inc. v. Aetna Cas. & Sur. Co.* (Oct. 2, 1991), Hamilton App. No. C–900283, unreported, 1991 WL 201651 (*"Morton I "*), wherein we determined, under Ohio's choice-of-law analysis, that application of Ohio law to the issues *sub judice* was inappropriate.

The facts can be summarized as follows.  Morton seeks insurance coverage for property damage, bodily injury, and personal injury resulting from hazardous waste generated by it or its predecessors and transported to Western Processing Company's ("Western") hazardous waste site, where it subsequently caused environmental damage to both Western's property and the adjoining property owned by Standard Equipment Company ("Standard").  The environmental damage occurred in Kent, Washington.  Consequently, Morton and Thiokol Corporation sought, among other relief, a declaration that Aetna was liable for

---

1.  While Aetna refers to Morton's motion as a motion for partial summary judgment, we note that Morton's motion was designated as a motion for final summary judgment as to the Western Processing Company and Standard Equipment Company claims.

unreimbursed defense costs and indemnification for monies paid in settlement of the claims.

On remand, the trial court granted Morton's motion for a ruling that the law of Washington be applied to the claims. On July 29, 1993, Morton moved the trial court to grant final summary judgment against Aetna as to the claims. On April 29, 1994, the trial court granted Morton's motion for summary judgment and ruled, *inter alia*, that Aetna must pay Morton $859,958.24, including interest in the amount of $310,058.05 as a result of Morton's settlement of the claims, and that Aetna must reimburse Morton for any future reasonable defense costs in connection with the Western claims and any future amounts Morton may pay under the previous settlement of these claims. The court's final judgment entry was filed May 20, 1994. Therein the court also determined, as a matter of law, that Morton was not entitled to attorney fees and prosecution costs. It further stated that the parties had not presented evidence of bad faith and, thus, those allegations were not addressed in its entry.

## III. SUMMARY JUDGMENT MOTION CLAIMS

Morton's motion for final summary judgment asserts that Aetna's insurance policy provides coverage for the environmental damage alleged in the claims under the policy's "occurrence" definition; that the damages paid by Morton resulted from "property damage" as defined by Aetna's policy; that the pollution exclusion in Aetna's policy did not bar coverage; that the damage at Western occurred during Aetna's coverage period; that Aetna is obligated to indemnify Morton for sums paid in settlement of the Standard actions under its Personal Injury Liability coverage; that Aetna should pay prejudgment interest; and that Aetna should pay prosecution costs.

## IV. INSURANCE POLICY LANGUAGE

The pertinent terms of Aetna's 1979–1980 policy, under which Morton seeks coverage, require Aetna to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence" and impose on Aetna the "duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent * * *." "Occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

The policy also contains a personal injury liability ("PIL") endorsement which requires Aetna to "pay on behalf of the insured all sums which the insured shall

become legally obligated to pay as damages because of injury (herein called 'personal injury') sustained by any person or organization and arising out of one or more of the following offenses committed in the conduct of the named insured's business: * * * Group C—wrongful entry or eviction, or other invasion of the right of private occupancy * * *." The endorsement also imposed on Aetna the "duty to defend any suit against the insured seeking damages on account of such personal injury even if any of the allegations of the suit are groundless, false or fraudulent * * *." The PIL endorsement is subject to all of the provisions of the policy not expressly modified by the endorsement and is thus subject to the "pollution exclusion" provision.

The "pollution exclusion" provision excludes from coverage:

"(f) * * * bodily injury or property damage [or personal injury] arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water * * *."

The exclusion also contains an exception, "if such discharge, dispersal, release or escape is sudden and accidental * * *." Under the policy Aetna had a duty to defend and indemnify its insured against an action for damages for personal injury, bodily injury or property damage resulting from an "occurrence," as defined in the policy, but had no duty to defend or indemnify against an action for damages resulting from pollution, unless the event giving rise to the damages was "sudden and accidental."

## V. AETNA'S ASSIGNMENTS OF ERROR

Aetna raises three assignments of error. In its first assignment of error, it contends that the trial court erred by applying Washington law in its analysis of the insurance contract. In its second assignment of error, Aetna argues that the trial court erred in granting Morton's motion for partial summary judgment. Aetna asserts in its last assignment of error that the trial court erred by granting prejudgment interest to Morton.

## A. FIRST ASSIGNMENT OF ERROR

■ In its first assignment of error, Aetna claims that the trial court erred by applying the law of Washington to its analysis of the insurance contract. We do not agree.

In *Morton I* we set forth in detail the correct analysis to be applied in resolving choice-of-law problems where the parties have failed to include a choice-of-law provision in their contract, relying on the principles set forth in 1 Restatement of

the Law 2d, Conflict of Laws (1971), Section 188. Section 188 states in pertinent part:

"(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

"(2) In the absence of an effective choice of law * * *, the contacts to be taken into account * * * include:

"(a) the place of contracting,

"(b) the place of negotiation of the contract,

"(c) the place of performance,

"(d) the location of the subject matter of the contract, and

"(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

"These contacts are to be evaluated according to their relative importance with respect to the particular issue."

In *Morton I*, this court determined that the record disclosed the following facts pertinent to Section 188:

"[P]laintiff Thiokol Corporation is a Delaware Corporation with its principal place of business in Utah. Thiokol Corporation was the successor in interest to Thiokol–Virginia, and plaintiff-appellee Morton International, Inc., with its principal place of business in Pennsylvania, is the successor by assignment of certain rights of Thiokol Corporation and Thiokol–Virginia. Ventron, which was acquired by Thiokol–Virginia in 1976, was subsequently named as a defendant in the Western Processing and Standard Equipment actions instituted in Washington. With respect to those actions, Morton–Thiokol sought indemnification and a defense under a policy of insurance issued to Thiokol–Virginia by Aetna. Aetna is a Connecticut corporation with its principal place of business in Connecticut. Negotiations for the Aetna insurance policies issued to Morton–Thiokol and its predecessors were conducted annually in Pennsylvania and Connecticut, and the policies were delivered to Morton–Thiokol in Pennsylvania."

In ruling that it would apply the law of the state of Washington to the cause *sub judice*, the trial court reasoned that Washington was the state where each environmental site was located and, thus, Washington had the most significant relationship with the insurance coverage issue of the action. In support of this decision, the trial court relied on the Restatement of Law relied on in *Morton I* and on this court's decision in *Morton Internatl., Inc. v. Harbor Ins. Co.* (1992), 79 Ohio App.3d 183, 192, 607 N.E.2d 28, 33–34, where we held, in an action to

determine whether the pollution and petroleum exclusions of an excess liability carrier excluded coverage for the cost of cleaning up an Ohio waste disposal site, that:

"With respect to the Summit claims, Ohio is the place of performance and the situs of the subject matter of the Harbor policy. Under the principles set forth in Section 188, Ohio may fairly be said to bear the most significant relationship to the policy. Compare *Morton Internatl., Inc. v. Aetna Cas. & Sur. Co.* (Oct. 2, 1991), Hamilton App. No. C–900283, unreported, 1991 WL 201651.  * * *"

Our review of the record in this case, which also involves whether an insurer is responsible for the cost of cleaning up a disposal site, convinces us that the state of Washington, which is the "place of performance and the situs of the subject matter" of Aetna's policy, bears the most significant relationship to the Aetna policy issued to Morton's predecessor. Based upon our determination in *Morton Internatl., Inc. v. Harbor, supra,* and 1 Restatement of the Law 2d, Conflict of Laws (1971), Section 188, we hold that the trial court did not err by applying the law of the state of Washington in its analysis of this action.

■ We also note that Aetna, in a parallel action in New Jersey, won an injunction restraining Thiokol from prosecuting its action in Ohio by arguing, in part, that the "vast majority" of the sites were located in New Jersey, as were the vast majority of witnesses and evidence, and that "New Jersey has the most significant contacts with the parties, and the greatest interest in resolving the insurance coverage issues." To support that statement it pointed out that the dumping of hazardous waste in New Jersey creates a great societal problem in New Jersey, that a number of the sites are located in New Jersey, and that the citizens of New Jersey have been affected by the waste disposal. Although this argument was presented in the context of jurisdiction and not choice of law, we believe that estoppel precludes Aetna from now denying that the state where the hazardous waste sites are located has the most significant contacts with the insurance contracts. See, *e.g., Claxton v. Simons* (1963), 174 Ohio St. 333, 22 O.O.2d 386, 189 N.E.2d 62; *Bassett v. Bassett* (C.P.1946), 46 Ohio Law Abs. 172, 34 O.O. 53, 68 N.E.2d 409. Accordingly, Aetna's first assignment of error is overruled.

## B.  SECOND ASSIGNMENT OF ERROR

In Aetna's second assignment of error, it is urged that the trial court erred by granting Morton's summary judgment motion as to the claims. In support of this assignment Aetna argues that (1) the trial court improperly applied Washington rules of contract interpretation and construction; (2) both parties understood and intended that the pollution exclusion endorsement would bar coverage for claims

arising from gradual pollution contamination; (3) the pollution exclusion is clear and unambiguous and excludes coverage for the claims; (4) questions of fact remain as to whether Morton expected or intended the pollution; (5) the trial court erred in designating Aetna's 1979–1980 policy to respond to the Western site claims; and (6) Aetna owes no duty to defend or indemnify Morton under the PIL endorsement. We find Aetna's fourth and sixth arguments in support of its second assignment of error to be persuasive and sustain Aetna's second assignment of error on those issues.

## 1. STANDARD OF REVIEW

■ Initially, we note that it is beyond cavil that in cases involving conflicts of laws, the local law of the forum governs procedural matters. See *Guider v. LCI Communications Holdings Co.* (1993), 87 Ohio App.3d 412, 417, 622 N.E.2d 415, 419. Ohio law provides that before summary judgment can be granted, it must be determined that (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion and that conclusion, when viewing the evidence most strongly in favor of the party against whom the motion is made, is adverse to that party. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274; Civ.R. 56(C). Likewise, "[a] motion for summary judgment forces the nonmoving party to produce evidence on any issue for which that party bears the burden of production at trial." *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus. In order to determine whether there exists a genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law, a court may consider only "the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action * * *." Civ.R. 56(C).

## 2. WASHINGTON LAW

Aetna first argues that the trial court misapplied the Washington rules of insurance contract construction. Specifically, Aetna maintains that the trial court failed to "engage in the crucial analysis of determining the intent of the parties" as to the disputed coverage terms. It asserts that had the appropriate inquiry been made, it would have been clear that both Morton and Aetna intended that the claims would not be covered.

■ While Aetna may disagree with the trial court's order, it has presented no evidence in the record to support its argument that the trial court did not correctly apply Washington law in its analysis of the interpretation of Aetna's

policy. The trial court's order granting Morton summary judgment stated as a conclusion of law that a court may consider extrinsic evidence in interpreting a written contract and that an ambiguity exists where there is more than one reasonable interpretation of the language of the contract or the extrinsic evidence. It also indicated that it examined extrinsic evidence such as affidavits, admissions, deposition transcripts, and authenticated documents of the record. Absent any showing of an irregularity, we must presume the regularity of the trial court's actions. Therefore, Aetna's first argument fails.

In its second argument Aetna contends that the mutual intention of both it and Morton was that the pollution exclusion endorsement, which is referred to as the "qualified pollution exclusion" by Washington courts, would operate outside the parameters of the occurrence provision and bar coverage for gradual pollution claims. The relevant extrinsic evidence, however, fails to demonstrate that the endorsement was a negotiated provision such that mutual intent would be helpful in its interpretation. In beginning our discussion it is important to set forth the analysis required to interpret insurance contracts as set forth by Washington law. In *Washington Pub. Util. Dists. Util. Sys. v. Pub. Util. Dist. No. 1* (1989), 112 Wash.2d 1, 10–11, 771 P.2d 701, 706–707, the Supreme Court of Washington explained that:

"Insurance policies are to be construed as contracts, and interpretation is a matter of law. *State Farm Gen. Ins. Co. v. Emerson*, 102 Wash.2d 477, 480, 687 P.2d 1139 [1141–1142] (1984). The entire contract must be construed together in order to give force and effect to each clause. *Morgan v. Prudential Ins. Co. of Am.*, 86 Wash.2d 432, 434, 545 P.2d 1193 [1194–1195] (1976). The court must enforce the contract as written if the language is clear and unambiguous. *Morgan*, at 435 [545 P.2d at 1195]. However, if the *language on its face* is fairly susceptible to two different but reasonable interpretations, the contract is ambiguous, and the court must attempt to discern and enforce the contract as the parties intended. *Greer v. Northwestern Nat'l Ins. Co.*, 109 Wash.2d 191, 198–200, 743 P.2d 1244 [1248–1249] (1987); *Morgan*, 86 [Wash.2d] at 435 [545 P.2d at 1195]. In the event of an ambiguity, the contract will be construed in favor of the insured. *Greer* [109 Wash.2d], at 201 [743 P.2d at 1249]. *Morgan* [86 Wash.2d], at 435 [545 P.2d at 1195].

"The court will determine the parties' intent by viewing the contract as a whole, examining its purpose, objective, and subject matter, the circumstances of its making, the subsequent conduct of the parties, and the reasonableness of their respective interpretations. *Greer* [109 Wash.2d], at 200 [743 P.2d at 1248] (quoting *Stender v. Twin City Foods, Inc.*, 82 Wash.2d 250, 254, 510 P.2d 221 [224] (1973)). The contract will be given a practical and reasonable interpretation that fulfills the object and purpose of the contract rather than a strained or

forced construction that leads to an absurd conclusion, or that renders the contract nonsensical or ineffective. *Morgan,* at 434–35 [545 P.2d at 1194–1195]." (Emphasis *sic.*)

The Supreme Court of Washington has further explained that:

"Undefined terms should be given their plain, ordinary, and popular meaning. *Boeing Co. v. Aetna Cas. & Sur. Co.,* 113 Wash.2d 869, 881, 784 P.2d 507, 87 A.L.R. 4th 405 (1990). The language in standard form policies is interpreted in accord with the understanding of the average purchaser even if the insured is a large corporation with company counsel. *Boeing,* at 882–83 [784 P.2d at 513–14]." *Queen City Farms, Inc. v. Central National Ins. Co. of Omaha* (1994), 126 Wash.2d 50, 65–66, 882 P.2d 703, 712.

■ While ambiguity in a contract need not exist before evidence of the circumstances surrounding the making of the contract may be admitted, such evidence is substantially limited in purpose and use. *Lynott v. Natl. Union Fire Ins. Co.* (1994), 123 Wash.2d 678, 871 P.2d 146. Washington law is clear that it applies the context rule to interpreting insurance contracts:

" ['] [P]arol evidence is admissible to show the situation of the parties and the circumstances under which a written instrument was executed, for the purpose of ascertaining the intention of the parties and properly construing the writing. Such evidence, however, is admitted, not for the purpose of importing into a writing an intention not expressed therein, but with the view of elucidating the meaning of the words employed. Evidence of this character is admitted for the purpose of aiding in the interpretation of what is in the instrument, and not for the purpose of showing intention independent of the instrument. It is the duty of the court to declare the meaning of what is written, and not what was intended to be written. If the evidence goes no further than to show the situation of the parties and the circumstances under which the instrument was executed, then it is admissible.['] " *Berg v. Hudesman* (1990), 115 Wash.2d 657, 669, 801 P.2d 222, 229–230, quoting *J.W. Seavey Hop Corp. v. Pollock* (1944), 20 Wash.2d 337, 348–349, 147 P.2d 310, 316.

"Unilateral or subjective purposes and intentions about the meaning of what is written do not constitute evidence of the parties' intentions." *Lynott,* 123 Wash.2d at 684, 871 P.2d at 149. The extrinsic evidence must show an objectively manifested mutual intent as to the meaning of the disputed terms of the contract. *Id.* at 684–685, 871 P.2d at 149.

The record discloses that Aetna and Thiokol, through George Floyd, a former Thiokol employee in charge of procuring insurance coverage for Thiokol, negotiated the terms of the insurance policies on a yearly basis. Floyd declared in his May 17, 1988 affidavit that "in all of its insurance contracts with Thiokol, Aetna

never deviated from the standard language for the pollution exclusion or any other provisions contained in the basic insuring agreements, including the definitions of 'occurrence' and 'property damage' and the PIL coverage endorsement." Floyd testified in his deposition that Morton asked Aetna to deviate from the standard language of the pollution exclusion, but Aetna refused to do so.

In *Queen City Farms, supra,* the Supreme Court of Washington discussed extrinsic evidence as to the mutual intent of the parties to a nonnegotiated term of an insurance policy and observed that "while evidence of the parties' mutual intent may be helpful in some contexts, we have recognized that sometimes language in standard policies does not involve mutual negotiations between the insurers and the insureds. * * * Similarly, as the New Jersey Supreme Court noted, the qualified pollution exclusion was drafted by the insurance industry; there was no participation by insureds in the drafting of the clause." *Id.,* 126 Wash.2d at 82, 882 P.2d at 721.

The language of the endorsement in the instant case is identical to the standard form qualified pollution exclusion set forth in *Queen City.* Because there is no evidence that the terms of the endorsement were negotiated, the mutual intent of the parties is not helpful in interpreting the terms.

Furthermore, the evidence in the record fails to demonstrate an "objectively manifested mutual intent" as to what, if any, coverage was affected by the policy's pollution exclusion endorsement. Floyd testified that during the first renewal period in which the pollution exclusion was discussed, he believed that, according to statements by Aetna employee Ed Thompson, the exclusion was taking coverage away from Thiokol and there was no buy-back available. He also testified that it was his understanding based on what Aetna had told him that neither Aetna nor Thiokol was "very clear on what the full impact of the pollution exclusion would be." When he asked Aetna representatives what coverage was being taken away the answer was "we're not sure of the full extent of the endorsement either." The representatives could not give examples and relied purely on the words of the endorsement.

Floyd testified that in view of the "sudden and accidental" language, he believed some coverage remained for pollution claims. From his impression, he did not believe Aetna understood the endorsement to eliminate coverage for all pollution claims. He believed Aetna's policy provided off-site coverage and that Aetna would have covered a situation in which Thiokol contracted with a third party to dispose of its waste off-site. The first time Aetna indicated that the endorsement applied to off-site plants was in the early 1980s via a declination letter.

There was no discussion as to the meaning of sudden or accidental, but Floyd believed "sudden" meant unexpected or unintended and "accidental" meant a fortuitous event. He stated that he was paraphrasing and not interpreting the endorsement when he wrote in a memorandum:

"Effective January 1, 1971, our Comprehensive General Liability Insurance policy will be endorsed to eliminate coverage for claims for bodily injury or property damage arising out of or caused by pollution or contamination unless such pollution or contamination is sudden and accidental."

Floyd testified that from 1970 he attempted to have the endorsement eliminated or to get coverage in its place. In fact, the endorsement was discussed at almost every renewal meeting, formally or informally. He stated that during the years of the renewal meetings with Aetna it was never made clear to him what was being eliminated and what coverage remained. Floyd, meanwhile, attempted to buy back coverage because, although he did not know what coverage had been deleted, he felt something had been taken away without a reduction in premiums. He saw the coverage he sought as an alternative suggestion to the coverage he had, not as a replacement for what the exclusion took away. Because Floyd could not determine what the gaps in coverage were, he could not correctly evaluate alternative coverage. He was looking for a buy-back of coverage for unknown slow leaks because it was one incident he could think of that was probably excluded by the endorsement.

Jeffrey Sandburg, Morton's risk manager who purchased environmental impairment liability ("EIL") insurance in the 1980s, testified that he did not understand at the time he purchased the EIL coverage the meaning of "sudden and accidental" as used in an insurance policy. He explained that had the insurance industry not been trying to differentiate between gradual as opposed to sudden and accidental, Morton would have been comfortable with the comprehensive general liability coverage it had. He did not agree with the industry interpretation, but he did not know how the courts would determine the policy language; thus he purchased EIL coverage for protection in case the legal interpretation of "sudden and accidental" confirmed the industry's. He personally believed the comprehensive general liability policy covered third-party-liability situations where Morton no longer had "control" of the material which then caused pollution off-site, or when Morton had done "state-of-the-art things" and contamination emanated from its premises.

A letter written by Gerald M. Brown, Aetna's superintendent of special commercial accounts, informed Thiokol's broker that the endorsement was to be placed in the policy. This letter was sent by the broker to Floyd and contains the statement:

"We subscribe to the philosophy that injury or damage due to pollution can be avoided. We believe that bodily injury or property damage arising from uncontrolled or inadequately controlled emissions is essentially a business risk because control or lack of control over the regular emission of pollutants results primarily from a decision of management.

"Coverage for pollution or contamination is not provided in most cases, under present policies because the bodily injury or property damage can be said to be expected or intended and thus excluded by the definition of occurrence. The attached exclusion is meant to clarify this situation in order to avoid any future questions of intent. Coverage, as you will note, is still provided for bodily injury or property damage caused by pollution or contamination when the pollution or contamination results from an accident."

Other Aetna memoranda indicate that the endorsement was not intended to cover gradual pollution. A December 11, 1981 memorandum which was contained in Thiokol's broker's file states, however:

" * * * Although the standard CGL policy covers 'sudden and accidental pollution' (excluded oil and gas), such policies do not cover gradual (nonsudden) and accidental pollution."

We cannot say that the evidence showed an objectively manifested mutual intent that the pollution exclusion endorsement bar coverage for claims that arose from gradual pollution discharges. If anything, the evidence demonstrates that neither party was clear as to what the language of the endorsement covered and what it excluded. Aetna's second argument is without merit.

### 3. AMBIGUITY OF CLAUSE

Aetna next argues that the endorsement in question is clear, unambiguous and excludes coverage of Morton's claims. Looking specifically at the phrase "sudden and accidental," the Supreme Court of Washington has determined otherwise and has construed the ambiguity "against the drafter-insurer and in accord with a reasonable interpretation of the policy language." *Queen City Farms, supra,* 126 Wash.2d at 83, 882 P.2d at 721. See *Key Tronic v. Aetna (Cigna) Fire Ins. Co.* (1994), 124 Wash.2d 618, 881 P.2d 201.

In *Queen City Farms* the court held that " 'sudden' means 'unexpected' in the context of CGL policies containing the qualified pollution exclusion. Thus 'sudden and accidental' means 'unexpected and unintended.' Both terms are given meaningful effect. Reading the occurrence clause and the exclusion together, pollution damage resulting from an accident, including continuous or repeated exposure to conditions, which is neither intended nor expected is covered under the occurrence clause. The exclusionary language of the qualified pollution exclusion precludes coverage for damage resulting from the listed

polluting events. The polluting event may be the discharge, dispersal, release, or escape of materials from a place of containment into the environment where they cause damage. Coverage is re-triggered, however, under the exception to the exclusion, where the discharge, dispersal, release, or escape is sudden and accidental, *i.e.*, unexpected or unintended. Therefore, if the damage results from the dispersal of materials into the groundwater from a place of containment where the insured believed they would remain or from which they would be safely filtered, and that dispersal was unexpected and unintended, then coverage is provided under the policies." *Id.*, 126 Wash.2d at 90–91, 882 P.2d at 725.

Aetna's third issue has no merit as it applies to the ambiguity of the pollution exclusion.

## 4. WHETHER POLLUTION WAS INTENTIONAL

In granting Morton's motion for summary judgment, the trial court's conclusions of law included, *inter alia*, that the environmental *damage* alleged in the claims against Morton was not excluded by the occurrence definition of Aetna's policy unless Morton intended or subjectively expected the damage to occur. The court further concluded that the "sudden and accidental" language of the pollution exclusion endorsement is essentially a restatement of the "occurrence" definition.[2] In its statement of undisputed facts, the trial court found that Morton neither intended nor expected the environmental damage to the property of either Western or the neighboring Standard.

Under Washington law, both the "occurrence" definition and the qualified pollution exclusion are viewed under a subjective standard. *Queen City Farms, supra.* Moreover, we note that the burden of proof is on the insured to establish that the injury or damage under the "occurrence" definition was neither expected nor intended. *Id.* We believe, relying on the court's analysis in *Queen City Farms, supra,* that, in part because the insured is better able to demonstrate its subjective expectation and intention, it must bear the same burden of proof of its expectation and intention under the "occurrence" definition which it also bears the burden of proving under the pollution exclusion. In the instant case, Aetna raises the issue of whether summary judgment is appropriate on the factual questions of whether Morton expected or intended the property damage, and whether the escape of the polluting materials from the Western site was sudden and accidental, *i.e.*, unexpected and unintended.

---

2. We must clarify, however, that Washington law does not interpret the pollution exclusion and the occurrence clause as "entirely coextensive"; the focus of the pollution exclusion is on the polluting event, while the occurrence clause focuses on the damage. *Queen City Farms, supra.*

The record reveals that during the period from 1975 to 1977, Ventron, a predecessor of Morton, was disposing of its boron sludge waste at the Western site in the state of Washington. Robert Holman testified during his deposition that he has been the technical manager at Ventron's Washington plant since 1975. In that capacity he is in charge of maintenance and engineering at the plant. In 1975, Ventron began to ship its boron waste via a third-party carrier to the Western Processing site.[3] According to Holman, the Washington Department of Ecology recommended Western. Further, Holman established that Western had obtained a discharge permit[4] from the Department of Ecology for disposing of the boron waste which Western personnel represented would be neutralized in order to produce fertilizer and recycle the oil that was contained within. Holman also stated that he knew the Western site was located in a floodplain.

Holman acknowledged that he did not personally visit the Western site until approximately two years after Ventron ceased the disposal of its waste there.[5] He described the site as "sloppy" and containing rusting drums of waste.

John Durrell, the manager of Ventron's Washington plant since 1975, acknowledged that the boron sludge, if not properly contained, could cause environmental damage. He further testified, *inter alia,* that Holman visited the Western site sometime in 1979. Holman's report to Durrell concerning the condition of the site entered into Ventron's decision to cease using Western to dispose of its waste.[6]

The record also reveals that two Ventron employees, Dick Jump and Grant Miller, transported waste in fifty-five-gallon drums from the Ventron plant to the Western site. They described the latter location as "muddy and dirty" with diked areas that were overflowing.[7]

Ventron's employees were aware of the fact that the boron sludge, if not contained, could harm the environment. Ventron's employees also knew that Western did not possess a license to store the boron sludge. Moreover, Ventron

---

3. The record discloses that on approximately two occasions, Ventron's waste was delivered to the Western site by Ventron employees.

4. Holman explained that since Western was in possession of a discharge permit for the environmental waste, he assumed that the Department of Ecology had reviewed the entire operation, including storage and handling.

5. In fact, the record reveals that no one from Ventron visited the Western Processing site prior to Ventron sending its waste there.

6. According to the testimony of Ventron employees, the primary reason for ceasing to utilize Western was because it raised the cost of receiving Ventron's waste.

7. The employees did not recall the date of this delivery.

sent its waste to Western without first viewing the site. Accordingly, we conclude that because reasonable minds could reach different conclusions as to whether Morton or its predecessors subjectively expected or intended the migration of pollutants from the Western site or the resulting environmental damage, summary judgment is inappropriate. Therefore, we reverse this case and remand to the trial court for a final determination of this issue.

## 5. APPLICATION OF THE 1979–1980 AETNA POLICY

Aetna maintains next that the trial court erred by applying its 1979–1980 policy, issued to Morton's predecessor, to the instant claims. Specifically, Aetna argues that because Morton was aware of the potential for "pollution problems" at Western by 1978, the 1979–1980 policy is inapplicable under the "known risk" doctrine. The record reveals that contamination occurred by March 1980 and continued thereafter. While our disposition of the preceding Aetna argument convinces us that genuine issues of material fact remain to be resolved on whether the damage was expected or intended, we conclude that if it should be determined that the claims are covered under the "occurrence" definition, Washington law supports coverage for the claims under Aetna's 1979–1980 policy. Washington law holds that the time of an occurrence for insurance coverage purposes is determined by when the damage took place. *Transcontinental Ins. Co. v. Washington Pub. Util. Dists. Util. Sys.* (1988), 111 Wash.2d 452, 465, 760 P.2d 337, 345.[8] In other words, damage must occur during the policy period to trigger coverage, *Villella v. Pub. Emp. Mut. Ins. Co.* (1986), 106 Wash.2d 806, 812, 725 P.2d 957, 960, and when damage is of a continuing nature, the damage may be covered even though the act giving rise to the damage occurred prior to the effective date of the policy. *Gruol Constr. Co., Inc. v. Ins. Co. of N. Am.* (1974), 11 Wash App. 632, 524 P.2d 427. In other words, where the damage is continuous, the "occurrence" is continuous. *Castle & Cooke, Inc. v. Great Am. Ins. Co.* (1986), 42 Wash.App. 508, 711 P.2d 1108. This is so even if the tangible damage is minute. *Villella*, 106 Wash.2d at 814, 725 P.2d at 961. Thus, if it is determined that Morton neither expected nor intended the property damage at issue, any of Aetna's policies in force at the time the actual damage occurred would provide coverage.

## 6. PERSONAL INJURY LIABILITY ENDORSEMENT

The trial court ruled that Aetna's PIL endorsement contained in its 1979–1980 policy applied to the Standard claims.

---

8. We note that the occurrence of hazardous wastes leaking into the ground and contaminating the ground water and adjoining property constitutes "property damage" as defined in Aetna's policy. *Boeing Co. v. Aetna Cas. & Sur. Co.* (1990), 113 Wash.2d 869, 885, 784 P.2d 507, 516.

The PIL endorsement provides:

"The **company** will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as **damages** because of injury (herein called '**personal injury**') sustained by any person or organization and arising out of one or more of the following offenses committed in the conduct · of the **named insured's** business:.

"Group A—False arrest, detention or imprisonment, or malicious prosecution;

"Group B—the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising, broadcasting or telecasting activities conducted by or on behalf of the **named insured;**

"Group C—wrongful entry or eviction, or other invasion of the right of private occupancy * * *."

The Standard claims alleged that Western's mishandling of wastes contaminated Standard's soil and underground water, making it unfit for business or development and rendering it valueless. Consequently, Standard incurred expenses in evaluating the nature and extent of the pollution and in having the property cleaned. In its complaint Standard also included allegations of trespass and nuisance. Morton asserts that the trespassing and nuisance allegations in the underlying complaints clearly assert a "wrongful entry" and "an invasion of the right of private occupancy."

Courts which have considered whether the PIL endorsement applies to pollution claims have reached inconsistent conclusions. See *Legarra v. Federated Mut. Ins. Co.* (1995), 35 Cal.App.4th 1472, 42 Cal.Rptr.2d 101, and cases cited therein. The Supreme Court of Washington has not addressed this issue. We find persuasive, however, the analysis of the Court of Appeals of New York in *Columbia Cty. v. Continental Ins. Co.* (1994), 83 N.Y.2d 618, 612 N.Y.S.2d 345, 634 N.E.2d 946, in which the court determined that PIL coverage is inapplicable to property damage resulting from the contamination of land adjoining a waste disposal site by the migration of hazardous wastes from the site.

The PIL language in Aetna's policy contains language almost identical to the PIL endorsement discussed in *Columbia Cty.*, *supra*, and like that case, the controversy herein also focuses on the clause "wrongful entry or eviction or other invasion of the right of private occupancy." The Court of Appeals of New York explained, as follows, why the PIL endorsement does not apply to property. damage caused by pollution:

"It is clear that the personal injury endorsement does not provide coverage for the claims in the underlying complaint. * * * These allegations of continuing

nuisance, continuing trespass and invasion are not among the enumerated offenses covered by the personal injury endorsement. Nor do those offenses constitute the enumerated offense of 'wrongful entry or eviction or other invasion of the right of private occupancy.'

"We agree with the Appellate Division that the coverage under the personal injury endorsement provision in question was intended to reach only purposeful acts undertaken by the insured or its agents. Evidence that only purposeful acts were to fall within the purview of the personal injury endorsement is provided, in part, by examining the types of torts enumerated in the endorsement in addition to wrongful entry, eviction and invasion: false arrest, detention, imprisonment, malicious prosecution, defamation and invasion of privacy by publication. Read in the context of these other enumerated torts, the provision here could not have been intended to cover the kind of indirect and incremental harm that results to property interests from pollution." *Id.* at 627–628, 612 N.Y.S.2d at 349, 634 N.E.2d at 950.

The court also concluded that coverage for property damage was provided to the insured through "broad form comprehensive general liability insurance policies, all of which contain[ed] pollution exclusions. Under the construction of the policies urged by plaintiff, those pollution-related claims that are eliminated from coverage by the pollution exclusion would nevertheless be included in the personal injury endorsement. * * * It would be illogical to conclude that the claims fail because of the pollution exclusion while also concluding that the insurer wrote a personal injury endorsement to cover the same eventuality." *Id.* at 628, 612 N.Y.S.2d at 349, 634 N.E.2d at 950.

We find this reasoning applicable to the instant case in light of the fact that Standard's complaint fails to raise an allegation consistent with those defined risks enumerated in the PIL provision, and we agree with the court in *Spokane Cty. v. Am. Re–Ins. Co.* (May 12, 1993), E.D.Wash., No. CS–90–256–WFN, unreported, that private property damage due to pollution is not personal injury.

In conclusion, we sustain Aetna's second assignment of error to the extent that (1) genuine issues of material fact remain as to whether Morton or its predecessors subjectively expected or intended the pollution damage at issue in the underlying claims, and (2) the PIL endorsement is inapplicable to the Standard Equipment claims.

## C. THIRD ASSIGNMENT OF ERROR

Aetna's third and final assignment of error asserts that the trial court erred by awarding prejudgment interest to Morton. Morton argues that it is entitled to prejudgment interest pursuant to R.C. 1343.03(A), on the defense costs and

settlement payments made in the underlying claims. Because we have determined under Aetna's second assignment of error that genuine issues of material fact remain to be resolved, we will not consider Aetna's third assignment of error. App.R. 12(A)(1)(C).

## VI. MORTON'S CROSS–APPEAL

Morton, in its cross-appeal, raises one assignment of error in which it asserts that the trial court erred by refusing to grant it the costs of successfully litigating its coverage action. Whether or not Morton is successful in litigating its coverage action, we agree with the trial court's decision below that Morton is not entitled to attorney fees and prosecution costs for that litigation. The record demonstrates "none of the elements of bad faith, vexatiousness, or undue litigiousness" required for the awarding of attorney fees and prosecution costs. *Motorists Mut. Ins. Co. v. Brandenburg* (Sept. 1, 1993), Hamilton App. Nos. C–920346 and C–920347, unreported, 1993 WL 332292. Morton's assignment of error is overruled.

Accordingly, the judgment of the Hamilton County Court of Common Pleas is affirmed in part and reversed in part. We remand this matter to the trial court for further proceedings in accordance with this opinion and law.

*Judgment accordingly.*

DOAN, P.J., and SUNDERMANN, J., concur.

## ON RECONSIDERATION.

### Decided Nov. 3, 1995.

This cause came on to be considered upon the motion of appellee and cross-appellant Morton International, Inc. ("Morton") filed herein to certify a conflict and upon Morton's application for reconsideration of the opinion filed herein on September 29, 1995.

The court being fully advised in the premises finds that said motion to certify is not well taken and that the same ought to be and hereby is overruled; however, the court finds that the application for reconsideration is well taken and is granted for the reason that this court, in overruling Morton's assignment of error in its cross-appeal, based its determination on this court's decision in *Motorists Mut. Ins. Co. v. Brandenburg* (Sept. 1, 1993), Hamilton App. Nos. C–920346 and C–920347, unreported, 1993 WL 332292, which was reversed by the Ohio Supreme Court in *Motorists Mut. Ins. Co. v. Brandenburg* (1995), 72 Ohio St.3d 157, 648 N.E.2d 488.

Wherefore, it is the order of this court that Section VI of the opinion dealing with the cross-appeal of Morton concerning whether the trial court erred in denying Morton's motion for attorney fees is vacated, held for naught and is amended as set forth below.

Morton's single assignment of error is overruled at this time as being premature because until it is determined that Morton or its predecessors did not subjectively expect or intend the migration of pollutants or the resulting environmental damage at issue in the underlying claims, a genuine issue of material fact to be determined as set forth in the opinion, the trial court should defer a decision as to whether Morton is entitled to attorney fees. If it is determined, however, that Morton did not subjectively expect or intend the migration of pollutants or the resulting environmental damage at issue in the underlying claims and that appellant and cross-appellee Aetna Casualty & Surety Company is liable for coverage of such claims, then it shall also be determined whether attorney fees sought by Morton are "necessary or proper" pursuant to R.C. 2721.09.

DOAN, P.J., and HILDEBRANDT and SUNDERMANN, JJ., concur.